COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

———————————————— x

AMERICAN SIGNATURE, INC.,
and SEI, INC.
4300 East Fifth Avenue
Columbus, OH 43219

                       Plaintiffs,

      v.

MOODY'S INVESTORS SERVICES, INC.,
and THE McGRAW-HILL COMPANIES,
INC., d/b/a STANDARD AND POOR'S
RATING SERVICES,
7 World trade center
250 Greenwich St.
New York, NY 10007

                       Defendants.

———————————————— x

Case No. 09CVH 08 13212

TRIAL BY JURY DEMANDED

## COMPLAINT

Plaintiffs American Signature, Inc. ("ASI") and SEI, Inc. ("SEI"), for their complaint against defendants Moody's Investors Services, Inc. ("Moody's") and The McGraw-Hill Companies, Inc., d/b/a "Standard & Poor's Rating Services" ("S&P") (together, the "Rating Agencies" or "defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.    This action arises from the Ratings Agencies' egregious fraud in convincing plaintiffs and other investors to rely, in making their investment decisions, upon the Rating

Agencies' ratings of the creditworthiness of securities – ratings that that Agencies falsely represented were objective, independent, and derived from valid methodologies.

2.     In fact, the Ratings Agencies fraudulently concealed the truth – that, particularly in regard to certain complex auction rate securities ("ARS") based upon subprime mortgage-related derivatives, i) the Ratings Agencies competed to deliver to the issuers of such ARS highly and unjustifiably favorable ratings in order to convince the issuers to retain them, ii) the Ratings Agencies participated in structuring the very securities they were supposed to rate objectively, and iii) the ratings methodologies the Ratings Agencies were using were outdated, inappropriate and inapplicable.

3.     As a result of defendants' fraud, they assigned egregiously misleading high "investment grade" ratings to ARS, defendants thereby garnered lucrative fees from the issuers, and plaintiffs became the owners of now worthless ARS and have suffered tens of millions of dollars in losses.

4.     ASI, a furniture retailer, and its affiliate, SEI, became the victims of defendants' fraud because they had established conservative investment policies for their cash management accounts that relied explicitly upon defendants' ratings schemes. Intending to permit investment of their cash in only safe and liquid "cash equivalent" securities, plaintiffs expressly restricted their former investment advisor, Lehman Brothers, Inc. ("Lehman"), to purchase only securities that carried high "investment grade" ratings from one or more of the major nationally recognized statistical rating organizations ("NRSROs"), including defendants Moody's and S&P. In doing so, plaintiffs relied upon Moody's and S&P's representations that their ratings were the product

of current, unbiased, objective analyses and reflected Moody's and S&P's independent and good faith conclusions as to the creditworthiness of the rated securities.

5.    However, as Moody's and S&P knew, but concealed from plaintiffs and the investment community, the ratings that Moody's and S&P assigned to the complex ARS purchased for plaintiffs' accounts had no basis in fact. Moody's and S&P, for example, had developed new statistical methodologies to rate these complex new securities, but refused to implement these new methodologies because doing so would have cut into profits. Accordingly, Moody's and S&P instead rated the ARS using their preexisting, outdated and inapplicable methodologies for rating much less complex, ordinary corporate bonds – even though Moody's and S&P knew that this would result in ratings that were fallacious and unreliable.

6.    Moreover, while Moody's and S&P's repeatedly represented to investors, including plaintiffs, that their opinions were independent and their methodologies objective, the opposite was true. Moody's and S&P concealed from plaintiffs and many other members of the investing public that, far from being neutral reviewers of the new complex securities, Moody's and S&P had strong incentives from their compensation structure to deliver highly favorable investment grade ratings – incentives that effectively negated whatever independence Moody's and S&P might otherwise have had. Most of the compensation issuers paid to the Rating Agencies for rating a complex structured product such as ARS (unlike for rating corporate bonds) was paid once the Rating Agency was selected by issuer (or its investment bank) to rate the product based on the Agency's preliminary risk evaluation of the product. Consequently, Moody's and S&P were under strong competitive and financial pressures to deliver favorable evaluations of the ARS to win the issuer's business and capture lucrative fees.

7.     These competitive pressures led Moody's and S&P not only to inflate the preliminary and final ratings they assigned the ARS, but also to work directly with the issuers in structuring the complex securities on which those ARS were based so Moody's and S&P could try to justify the investment grade ratings necessary to induce investors such as plaintiffs to purchase the securities. By working directly with the investment banks and the issuers, Moody's and S&P made it possible to market such securities and, in return, earned hundreds of millions of dollars in fees, giving them profits that were vast multiples of what they had reaped in the past.

8.     In reliance upon the unjustified investment grade ratings Moody's and S&P applied to ARS that were based upon subprime mortgage-related derivatives, Lehman purchased on plaintiffs' behalf hundreds of millions of dollars worth of those ARS. Now that the true risks of those securities have been revealed by the exploding subprime mortgage crisis, plaintiffs are holding approximately $70 million worth of securities that are essentially worthless.

## THE PARTIES

9.     ASI is a corporation formed under the laws of the State of Ohio, with its principal place of business at 1800 Moler Road, Columbus, Ohio 43207.

10.    SEI is a corporation formed under the laws of the State of Nevada, with its principal place of business at 1800 Moler Road, Columbus, Ohio 43207.

11.    Defendant Moody's is a Delaware corporation with its principal place of business in New York. Moody's is an NRSRO that holds approximately a 40% share of the world's credit ratings market.

12.     Defendant S&P is a Delaware corporation with its principal place of business in

New York. S&P is an NRSRO that holds approximately a 40% share of the world's credit

ratings market.

## STATEMENT OF FACTS

13.     Plaintiffs are retail businesses that maintain substantial amounts of their assets in

cash or other highly-liquid investments to meet various business contingencies – such as paying

vendors and service providers, satisfying tax obligations, meeting compensation commitments,

and investing in new business opportunities. To protect their cash, plaintiffs had always placed it

in traditional short-term cash management instruments that were liquid and safe, such as

commercial paper, U.S. government obligations, variable rate demand notes, repurchase

agreements, or money market instruments.

14.     To ensure safety, plaintiffs limited their investments to those carrying high ratings

from the three principal NRSROs:  Moody's, S&P and/or Fitch IBCA.  Plaintiffs' conservative

investment policy was to invest only in those short-term securities that had received a rating of

"A2"[1] or higher from Moody's or of "A"[2] or higher from S&P ("High Investment Grade

Rating").  As an additional protection, plaintiffs stipulated that at least 80% of the securities

purchased for their cash management accounts had to have ratings superior to "A/A" – i.e., they

had to be designated "Aa" or higher from Moody's and "AA" or higher from S&P.

---

[1]     Moody's adds the numerical modifiers 1, 2, and 3 to the letter-grade ratings from "Aa" through "Caa" – a "1" to indicate that the security ranks in the higher end of its letter category; a "2" to indicate that it ranks in the mid-range of its letter category; and a "3" to indicate that it ranks in the lower end of its letter category.

[2]     S&P assigns modifiers letter-grade ratings from "AA" to "CCC," with the addition of a plus (+) or minus (-) sign to show relative standing within a letter category.

15.     The current world-wide financial crisis was precipitated at least in part by widespread defaults on subprime mortgages – loans at higher interest rates made to borrowers with riskier credit histories.

16.     The impact of these defaults on the world's financial system was enormously magnified because the subprime mortgages were packaged together and securitized as complex structured debt securities, such as residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs"). RMBS, CDOs and the "Structured Product ARS" related to them were sold to investors on a massive basis and spread the substantial risk of default on those subprime mortgages to virtually every corner of the globe.

17.     The RMBS, CDOs and Structured Product ARS never could have been marketed widely without the substantial participation of the Rating Agencies. The issuance of and widespread distribution of such high risk debt securities depended upon their having received High Investment Grade Ratings from the NRSROs, including the Rating Agencies, for which issuers and investment banks were prepared to pay substantial fees. The Rating Agencies cast aside the objectivity that had been the hallmark of their business, participated in the very creation of these RMBSs, CDOs, and Structured Product ARS, applied High Investment Grade Ratings to those securities without any basis for doing so, and thereby ensured that these high risk securities would be purchased by all manner of unsuspecting investors, particularly including corporate treasury departments such as those at plaintiffs.

18.     Plaintiffs – each of which had distinctly conservative investment profiles – never had any intention of investing in risky subprime mortgage debt or in any securities derived from it. Indeed, plaintiffs – relying upon commonly-held understandings as to the meaning of High

Investment Grade Ratings – believed that, by having restricted their cash investments to highly liquid securities bearing only High Investment Grade Ratings, they had protected their cash from anything approaching the high risk of subprime mortgage debt. As set forth below, however, the Rating Agencies' profit-motivated and irresponsible application of High Investment Grade Ratings led directly to plaintiffs' purchase of hundreds of millions of dollars of Structured Product ARS. Plaintiffs now find themselves the unwitting victims of the subprime mortgage meltdown, stranded with $70 million of virtually worthless Structured Product ARS.

## I.   Moody's and S&P Actively and Knowingly Induced Investor Reliance on Their Ratings of RMBS, CDOs and Structured Product ARS

19.    The Rating Agencies were essential players in the marketing of RMBS, CDOs and Structured Product ARS. Based as they were upon risky subprime debt, these esoteric securities could never have been marketed broadly without ratings from the Rating Agencies that purported to provide independent, objective, reliable and unbiased assessments of the risk presented by such investments. According to the 2002 Congressional testimony of McDaniel, then President of Moody's: "[T]he main and proper role of credit ratings is to enhance transparency and efficiency in debt capital markets by reducing the information asymmetry between borrowers and lenders."

20.    Indeed, the Rating Agencies have publicly admitted that the RMBS, CDOs and Structured Product ARS could not have been proposed, issued or sold without the Rating Agencies' ratings. Frank Raiter ("Raiter"), S&P's former Managing Director and Head of Residential Mortgage-Backed Securities Ratings, acknowledged in 2008 that: "By regulation, institutional investment policy, and tradition, the sale of associated mortgage backed securities generally required ratings from two of the [Rating Agencies]." Therefore, "if [the Rating

Agencies] had stood up and said we're not going to [rate complex structured finance transactions], then the other players would have been forced to cut back. But everyone was having too good a time." According to Raiter, "the rating agencies were the oilers who kept the wheels of the train greased." As Richard Gugliada, S&P's former head of CDO ratings, stated, without ratings, the transactions simply "can't be done."

21.    According to Ohio's former attorney general, who investigated the Rating Agencies for mortgage fraud, "[the Rating Agencies] made the market. Nobody would have been able to sell these bonds without the ratings."

22.    Moreover, investors relied upon the ratings of structured finance products more than they did for ratings of other securities, because of the relative opacity of the structured finance markets. As one commentator has noted, the "details of the underlying asset pool and often the structure of the transaction are not publicly available for external scrutiny." This lack of publicly available information made "[t]he role of rating agencies . . . particularly important to the structured finance process. Investors rely on agency ratings when making purchase decisions because of the opacity [in the structured finance market]."

23.    Jerome Fons ("Fons"), a former Moody's Managing Director in charge of Credit Policy, explained investor reliance on structured product ratings as follows:

> Market participants relied heavily on the rating agencies when purchasing subprime related assets for at least three reasons. First, subprime RMBS and their offshoots offer little transparency around the composition and characteristics of the underlying loan collateral. Potential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool. Loan-by-loan data, the highest level of detail, is generally not available to investors. Second, the complexity of the securitization process requires extremely sophisticated systems and technical competence to properly assess risk at the tranche level.

> Third, rating agencies had a reputation, earned over nearly one
> century, of being honest arbiters of risk.

24.     Moody's and S&P actively cultivated investor reliance by portraying their ratings

as independent, objective and substantially accurate. For example, in a statement to the SEC on

November 21, 2002, Raymond W. McDaniel, the former President and current Chief Executive

Officer and Chairman of Moody's, portrayed Moody's as an independent provider of unbiased,

trustworthy ratings derived from a rigorous and judicious process:

- Objectivity and independence. Moody's internal policies and procedures have
  mitigated the latent conflict of interest that is inherent in the rating agency
  business model. As such, our rating opinions are the product of analysis that is
  unbiased and trustworthy.

- Predictive content. The predictive content of our ratings has been consistently
  mapped and measured. Moody's and unrelated academics have published studies
  on the relationship between our ratings and credit defaults. Research has shown a
  strong relationship between Moody's ratings and actual default experience. Put
  simply, corporate bonds that have received higher default from Moody's default
  less frequently on average than lower rated bonds.

- Judicious ratings process. Our ratings are arrived at through a rigorous and
  judicious process that tends not to react to transitory conditions in favor of longer-
  term considerations and ratings stability.

25.     S&P has made similar representations. Deven Sharma, President of S&P,

testified before Congress on October 22, 2008 that "[S&P's] core mission is to provide the

markets with quality, independent analysis" and "independence is a core principle of our

business." S&P's Tillman declared in a letter to the editor of the Wall Street Journal that "[o]ur

credit ratings provide objective, impartial opinions on the credit quality of bonds."

26.     In particular, Moody's and S&P induced investor reliance on the ratings of new

complex structured securities, such as the RMBS, CDOs and Structured Product ARS, by

emphasizing their comparability to the well-familiar ratings of conventional corporate debt.

27.     Moody's made repeated public statements – later revealed to be false – about the

comparability of its ratings models for structured finance products and corporate bonds. For

example, Moody's Code Implementation Report (April 12, 2006) proclaimed that "Structured

Finance Credit Ratings use the same symbol system and are intended to convey comparable

information with respect to the relative risk of expected credit loss." Likewise, in *Moody's:*

*Rating Symbols and Definitions*, Moody's represented the following:

> It is Moody's intention that the expected loss rate associated with a
> given rating symbol and time horizon be the same across
> obligations and issuers rated on the Global Scale. Moody's rating
> methodologies, rating practices and performance monitoring
> systems are each designed to ensure a consistency of meaning.
>
> . . .
>
> Moody's structured finance ratings are engineered to replicate the
> expected loss content of Moody's Global Scale.

Then, in his September 27, 2007 testimony before the U.S. Congress, Michael Kanef, the former

head of Moody's Asset-Backed Finance Rating Group responsible for RMBS, testified that:

> Moody's rating accuracy on mortgage-backed securities has been
> similar to its rating accuracy on other structured finance products,
> and, over long time horizons, comparable to the accuracy of
> Moody's corporate bond ratings.
>
> . . .
>
> [Moody's ratings] indicate[d] a high degree of consistency
> between structured finance and corporate ratings.

28.     S&P also proclaimed in a special report dated June 13, 2001, that its "approach, in

both policy and practice, is intended to provide a *consistent* framework for risk assessment that

builds reasonable ratings *consistency* within and across sectors and geographies" (emphasis

supplied). In the same report, S&P defined those "sectors" to include, among others, the "six

different sectors of the corporate market, [and] the three major sectors of the structured market

(asset-backed, commercial mortgage-backed, and residential mortgage-backed securities)." S&P Executive Vice President Tillman also reaffirmed S&P's commitment to consistent standards in her September 2007 letter to the editor of the Wall Street Journal, in which she explained that "we rate [structured] deals based on our criteria – criteria that are publicly available, non-negotiable and *consistently applied*" (emphasis supplied).

29. Not only did the Rating Agencies knowingly induce investor reliance on their ratings of RMBS, CDOs and Structured Product ARS, but they did so knowing that such reliance would operate to the investors' detriment. As expressed in a prophetic internal December 15, 2006 e-mail from Christopher Meyer, an Associate Director in S&P's Global CDO Group: "Rating Agencies continue to create and [sic] even bigger monster – the CDO market. Let's hope we are all wealthy and retired by the time this house of cards falters. :o)."

30. The Ratings Agencies' efforts to induce investor reliance worked to perfection. As was the case with plaintiffs' investment policies, the defendants' ratings were routinely embedded, or "hard-coded" into financial contracts and policies of banks, pension funds, insurance companies, investment funds and corporate investors, each of which defined risk tolerance in terms of those ratings. The Ratings Agencies were well aware of this fact. As Moody's McDaniel explained: "Ratings facilitate [the broad marketability of bonds] . . . because many [large U.S. investors] have prudential investment guidelines that rely in part upon ratings as a measure of desired portfolio quality." To "promote investor protection and financial market stability," ratings were even incorporated into "various legislative and regulatory frameworks," and became "tools employed by issuers, intermediaries, counterparties to financial and commercial contracts, large institutional investors and global regulators, among others."

**II.     The Rating Agencies Materially Misrepresented Their
         Independence and Objectivity, While Concealing Their
         Conflicts of Interest in Rating Structured Finance Products**

31.     While Moody's and S&P induced investor reliance by touting their reputations for

independence and objectivity in evaluating rated securities, they concealed from various

segments of the investing public – including plaintiffs – the truth about their conflicts of interest

when rating RMBS, CDOs and Structured Product ARS.

32.     In June 2005, Moody's adopted and published a Code of Professional Conduct in

which it represented that:

> In the rating process, Moody's maintains independence in its
> relationship with Issuers and other interested entities. . . . As a
> matter of policy, and in keeping with its role as an independent and
> objective publisher of opinions, Moody's retains complete editorial
> control over the content of its Credit Ratings . . . .

In that Code, Moody's reiterated its "commitment to maintaining the quality and integrity of the

rating process" and adopting "policies and controls to ensure that we maintain our independence

and properly manage potential conflicts of interest . . . ."

33.     S&P made similar representations about its independence and objectivity.  In

testimony before Congress on March 20, 2002, Ronald M. Barone, a former Moody's Managing

Director, stated:

> Standard & Poor's is – and has always been – independent of any
> investment banking firm, bank or similar organization. . . .
> Standard & Poor's is committed to objective ratings by
> independent rating committees comprised of analysts with credit
> experience in their areas.
>
> . . .
>
> Standard & Poor's credit ratings have gained respect and authority
> throughout the investment community because they are widely

understood to be based on independent, objective and credible
analysis.

. . .

Standard & Poor's Commitment to Objectivity

[Our] Guidelines and Code stress the overriding importance of
objectivity in our ratings process.

. . .

Indeed, independence, credibility and integrity are the foundations
of the Standard & Poor's ratings business and they are what
ultimately provide value to the marketplace.

Our rating opinions are based on an objective and independent
process that we consistently disclose and describe to the
marketplace.

34.     Again, in January 2002, S&P published a paper entitled, "Understanding Credit

Ratings," in which it represented:

A Standard & Poor's rating is based on principles of independence,
integrity and disclosure – the same standards that underlie market
confidence and acceptance of our ratings by investors worldwide.
The rating process is open and clear at Standard & Poor's. The
process remains consistent across different types of ratings and
different markets.

## A.     The Compensation Scheme for Rating RMBS, CDOs and Structured
Product ARS Undermined the Integrity of Defendants' Ratings

35.     Notwithstanding the defendants' professions of independence, their ratings

process was, in fact, rife with conflicts of interest. For example, the defendants would not

receive any substantial revenue for rating a structured finance product until after they won the

business to rate the product. Investment banks would decide which NRSRO to hire based upon

the NRSROs' preliminary evaluations of the structured products, for which the NRSRO would

be paid only a nominal fee. These preliminary evaluations might consist of a simple approval or

disapproval as to whether the proposed capital structure of the deal might justify the desired

rating or might predict the "expected loss" associated with the portfolio. If the NRSRO could

not reach the desired rating under the proposed structure, negotiation would typically ensue.

36.     Once selected to rate the structured product, the NRSRO would then undertake a

purportedly more comprehensive evaluation, and it was only after this phase was completed and

the rating published that the NRSRO would receive the most substantial portion of their

revenues. Hence, the NRSROs, including defendants, had incentives to issue favorable

evaluations early on to win the coveted business in the first instance, and then to remain pliable

throughout the process to ensure a substantial payment at the end.

37.     This pre-evaluation process gave investment banks enormous opportunities for

"ratings shopping" – where an underwriter would bring its proposed structured product deal to

multiple NRSROs to determine which would impose the least demanding requirements. Since

marketing a structured product deal typically required ratings from only two of the three major

NRSROs, competitive pressures induced the NRSROs to relax their parameters in order to make

their requirements as permissive as possible.

38.     This debasement of standards significantly impaired the accuracy of the Rating

Agencies' credit risk evaluations. The ratings process rapidly degenerated into a "race to the

bottom" in terms of quality – where, as one former Moody's executive described, "[s]upport

levels migrate[d] to the lowest possible values as agencies maneuver[ed] to maintain market

shares."

39.     Contrary to their denials, the Rating Agencies were willfully complicit in this

ratings shopping process. As former Moody's Managing Director Fons testified before Congress

on October 22, 2008: "A drive to maintain or expand market share made the rating agencies

willing participants in this shopping spree." Succumbing to competitive pressures, defendants

were, in effect, selling their ratings instead of their work.

40.     In fact, the defendants would sometimes sell their proprietary models to the

investment banks, so the banks could themselves manipulate the structure of their deals in an

attempt to justify the highest possible rating. By selling their analytical tools on the one hand,

and advising banks on asset composition and security structuring on the other, the Rating

Agencies were "playing both coach and referee" (Wall Street Journal, *Conflicts and the Credit

Crunch*, September 7, 2007) – in direct contravention of the independence, objectivity and

integrity that the Rating Agencies so ardently professed in their public statements.

41.     Competitive pressures on NRSROs were only heightened by the relative

concentration of issuers and banks in the structured finance space. As compared with the

corporate bond market, which comprises thousands of issuers, the investment banks that

specialized in creating structured products were few in number. Consequently, the loss of one

deal could represent the loss of millions of dollars in revenues to an NRSRO from that issuing

bank. As Professor John C. Coffee of Columbia University explained in his Congressional

testimony on September 26, 2007, the NRSROs had been "destabilized" by the "small number"

of "large repeat clients" that controlled access to structured finance deals:

> The major change that destabilized rating agencies appears to have
> been the rise of structured finance. . . [T]he rating agency is no
> longer facing an atomized market of clients who each come to it
> only intermittently (and thus lack market power), but instead large
> repeat clients who have the ability to take their business elsewhere.
> Today, structured finance accounts for a major share of some
> rating agencies' total revenues; equally important, these amounts
> are paid by a small number of investment banks that know how to
> exploit their leverage . . . .

42. Pleasing the client thus became the paramount objective within the Rating Agencies' cultures, supplanting ratings integrity as the overriding goal. As Brian Clarkson, Moody's former President and Chief Operating Officer, conceded to the company's board of directors in October 2007, Moody's had abandoned its own standards under the influence of banks, issuers, and investors in order to gain market share and reap its share of the subprime mortgage boom. Indeed, Clarkson stated that Moody's own self-interest had "color(ed)" the firms purportedly objective ratings, and that its analysts would "drink the kool-aid" in order to keep up the flow of new deals for Moody's to rate.

**B.     Despite Representations to the Contrary, Defendants Actively Participated in Creating the RMBS, CDOs and Structured Product ARS They Rated**

43. Despite their repeated public representations about their objectivity and neutrality, the Rating Agencies in fact played an active role in structuring complex securities according to a highly subjective, results-oriented approach. Indeed, the methodology employed by defendants to rate structured finance securities was anything but objective. Far from being passive reviewers, the Rating Agencies were intimately involved in structuring complex financial products – including those underlying Structured Product ARS – precisely to justify a desired rating. Thus, rather than conduct an analysis of objective factors to culminate in a rating, the Rating Agencies worked backwards: they started with the rating they knew would be required to market the complex securities to investors, and then worked with the investment banks to "structure" those securities in an attempt to justify the rating.

44. Moody's former President and Chief Operating Officer, Clarkson, has conceded that, in creating a structured finance product: "You start with a rating and build a deal around a rating." (Portfolio, *Overrated*, September 2007.) According to Moody's, structured finance

ratings were an "iterative process, giving feedback" to underwriters seeking to bring new RMBS and CDOs to market.

45.  The extent of the Rating Agencies' implication in the process – and lack of objectivity – has also been noted by several commentators. In September 2007, Joseph R. Mason, an Associate Professor of Finance at Drexel University and a Senior Fellow at the University of Pennsylvania's Wharton School who studied structured debt products with the Office of the Comptroller of the Currency, told the United States Congress that:

> [NRSROs] do more than opine; they play an active role in structuring RMBS and CDOs. They also serve as key sources of information about securitization performance and often enumerate measures that issuers must take to maintain ratings in troubled securitizations.

46.  The process started with the designation by the issuing bank of the target rating it required. The rating, in effect, became a type of "brand name" under which the structured products would be marketed. The Ratings Agencies would then work with the issuers on supposed "credit enhancements" – *e.g.*, subordination, collateral cushions, guarantees, amortization features, etc. – that were designed to justify the required rating. Each of these credit enhancements, however, reduced issuer profit. Accordingly, investment banks had a strong interest in awarding their business to the NRSROs that assigned the lowest "expected loss" designations, because lower expected losses resulted in higher profits. The defendants obliged their clients by keeping expected loss projections artificially low in order to keep ratings – and, with them, profits – artificially high.

47.  Unlike bond ratings for corporate issuers, whose financial statements could not be altered in the short term to "score" better ratings, structured finance products harbored great

flexibility. Consequently, in the words of one former Moody's executive, in the case of structured products, "the rating process became a negotiation."

48.     Defendants materially misrepresented and failed to disclose to investors such as plaintiffs the active role they played in structuring complex securities, including the Structured Product ARS, and the inherent conflicts of interest that utterly debased the objectivity of their ratings methodologies.

## III.    To Improve Their Profits, The Rating Agencies Knowingly Rated RMBS, CDOs and Structured Product ARS Using Inapplicable and Out-of-Date Processes

49.     In rating the complex RMBS, CDOs and Structured Product ARS, the Rating Agencies also applied processes and data they knew to be inaccurate, inapplicable and out-of-date. Thus, while the Rating Agencies led the investing public to believe that a AAA-rated CDO presented the same risk as a AAA-rated corporate bond, the Rating Agencies in fact had no basis for providing that comparison. The Rating Agencies did all of the foregoing without so informing the investing public – including the plaintiffs – and thereby misled the public and plaintiffs into relying upon ratings that had no objective basis.

50.     The Rating Agencies compromised their rating standards for structured products because doing so was immensely profitable. By 2008, NRSROs could receive between $750,000 and $1 million per issue of a structured finance security. According to Raiter, S&P's former Managing Director and Head of Residential Mortgage-Backed Securities Ratings, during his ten years with S&P, mortgage securitization grew from a $639 billion business to a $3.3 trillion business. Notably, subprime mortgage "production" alone grew from $35 billion to $807 billion over that time. When asked how profitable CDOs were for S&P, Gugliada answered, "[v]ery profitable . . . a typical fee would be something like a quarter of a million dollars per deal," and,

"in the busiest months, we were doing as many as 20, 25 per month." From 2002 to 2007, revenues from these transactions put S&P in the top ten of the S&P 500.

51.     Moody's bottom line fared similarly well from the expansion of mortgage-backed securitizations. By the time Moody's became a public company in 2000, rating structured finance products had become its top source of revenue. Initially, Moody's could receive between $200,000 and $250,000 to rate a $350 million mortgage pool, for example, while rating a municipal bond of a similar size might have generated just $50,000 in fees. Between 2000 and 2006, Moody's profits rose 375% and its share price quintupled. Moody's structured finance group grew to account for approximately 53% of Moody's revenue by the first quarter of 2007, up from 28% in 1998. By 2006, the firm had more revenue from structured finance alone – $881 million – than its entire revenue had been in 2001. From 2002 to 2007, revenues from these transactions made Moody's the third-most profitable company in the S&P 500-stock index – higher than Microsoft and Google. Misrepresenting the independence, objectivity and integrity of their ratings process proved a lucrative way of doing business for defendants.

52.     In furtherance of the profit objective, the voice of dissent was routinely quashed at Moody's and S&P by reassigning scrupulous analysts and supervisors to other divisions. As the Wall St. Journal reported, Moody's analysts deemed too "fussy" were reassigned, because "[a]nalysts who raised doubts about a deal could hurt revenues for the rating firm and investment bank." (Wall St. Journal, *At Request of Bond Issuers or Bankers, Credit-Rating Firms Switch Analysts*, May 23, 2008). Thus, analysts who demonstrated the very objectivity and independence that the Rating Agencies touted as their hallmarks were routinely kept down.

53.    The Ratings Agencies not only generated enormous revenue from rating RMBS, CDOs and Structured Product ARS, but the Rating Agencies also maintained their profits by refusing to incur the costs necessary to rate those securities properly. Specifically, both Moody's and S&P refused – primarily, if not solely, for profit reasons – to implement new models for rating RMBS, CDOs and Structured Product ARS.

54.    Prior to the advent of complex structured securities like RMBSs and CDOs, the Rating Agencies rated traditional debt securities like corporate bonds. The Rating Agencies generally employed mathematical "models" to assess the future performance of these debt securities. These models were mathematical representations of economic and other factors that were likely to impact an issuer's ability to make such payments, and included such metrics as the issuer's revenues, costs, or currency fluctuations in the markets in which the issuer conducts its business. By inputting into those models data reflecting various assumptions, the Rating Agencies were able to project the issuer's revenues and, accordingly, its ability to satisfy its obligations on debts those debts came due. The quality of the analyst's projections was determined by the metrics in the model and the data input into those metrics.

55.    In stark contrast, RMBS and CDOs were issued by specially created trusts holding pools of new mortgages and other assets, none of which had any prior history. Accordingly, in rating RMBS, CDOs and Structured Product ARS, the Rating Agencies did not have access to the type of historical issuer data upon which they had traditionally relied to provide a rating.

56.    The Rating Agencies knew full well that these traditional models were grossly inadequate for rating RMBS, CDOs and Structured Product ARS, but the Rating Agencies used

those traditional models anyway. Indeed, both defendants had created new, forward-looking

models and processes that would allow them to measure the performance of RMBS and CDOs

over time so the defendants could reassess the applicability of their ratings. As both Moody's

and S&P have admitted, however, each decided not to employ these new models and processes,

including the periodic reviews, because i) doing so would cut into their profits and ii) they were

only paid to rate the securities once – at the time of issuance.

## A.   S&P Rated Structured Products Even Though It Knew It Had No Workable Model For Doing So

57.     In a written statement to the U.S. House of Representatives on October 22, 2008,

Raiter, S&P's former Managing Director and Head of Residential Mortgage-Backed Securities

Ratings, explained that, beginning in the mid-1990s, S&P developed better, statistically-based

models for estimating default risk on individual loans and pools. As Raiter confirmed, "[i]t was

critical to maintain the best models as they were the linchpin of the rating process" and "[e]ach

version of the model was better than its predecessor in determining default probabilities."

58.     With the vast expansion of the housing market beginning in 2001, S&P then

developed its most comprehensive model for analyzing complex structured debt products to date,

one that would "cover[] the full spectrum of new mortgage products, particularly in the Alt-A

and fixed/floating payment type categories" – those categories that ultimately wrecked the

financial markets. In Raiter's words, the model was "by far the best yet developed."

59.     Shockingly, however, S&P's state-of-the-art model "was not implemented due to

budgetary constraints." S&P instead continued to employ a model that would not account for

new types of mortgages and their risks, because the company quite simply did not want to spend

the money. Raiter stated bluntly that S&P's management failed to implement the new model

because "it was expensive to build or acquire the growing data bases, perform the necessary statistical analysis, complete the [information technology] code modifications and implement and distribute new versions of the model," and, "[b]y 2001, the focus at S&P was profits for the parent company, McGraw-Hill – it was not on incurring additional expense."

60.     Raiter also advised Congress that, in his opinion, had S&P implemented the more refined methods for assessing default risk, the severity of the current market crisis might have been mitigated: "An unfortunate consequence of continuing to use out-dated versions of the rating model was the failure to capture changes in performance of the new non-prime products."

**B.     Moody's Rated Structured Finance Products Even Though it Knew it Had No Workable Model for Doing So**

61.     Like S&P, Moody's, at all relevant times, also knew that it did not have a ratings model that could provide a meaningful analysis of RMBS, CDOs and Structured Product ARS.

62.     Moody's rated RMBS, CDOs and Structured Product ARS by using a model that had been created to analyze simple corporate bonds. In an April 3, 2007 press release, Moody's conceded that these models were out of date, because they had been created in 2002 and lacked "key information" necessary to properly assess the attendant risks. According to Moody's, "[s]ince then, the mortgage market has evolved considerably, with the introduction of many new products and an expansion of risks associated with them. . . ."

63.     Moreover, Moody's knew that applying its outdated and unsuitable corporate bond models to complex structured products was producing ratings that were wildly misleading. According to Moody's own analysis, for example, corporate bonds that Moody's had rated Baa (its lowest investment grade rating) had had an average 2.2% default rate in the period prior to 2005. In contrast, CDOs to which Moody's had ascribed the same Baa grade had default rates of

24%. At no time did Moody's disclose to investors such as plaintiffs that, for example, a structured finance product, such as the Structured Product ARS, could be ten times riskier than a corporate bond bearing the same Moody's rating.

64.     Despite knowing that it did not have an appropriate model for analyzing structured finance products, and that the models it was using were producing wildly misleading ratings, Moody's nevertheless became the largest rater of RMBS, CDOs and Structured Product ARS. By 2006, Moody's rated nine out of every ten dollars of mortgage-related structured finance products. In 2007, Moody's rated about 94% of the $190 billion in mortgage-related and other structured finance CDOs issued, the second busiest year ever.

C.     **The Rating Agencies' Failure to Evaluate the Default Risk of the Underlying Subprime Mortgages, Despite Their Public Statements to the Contrary, Rendered Their Ratings of Structured Product ARS Completely Baseless**

65.     Any credible model for assessing the risk of RMBS, CDOs and Structured Product ARS had to include the likely default rate of the subprime mortgages and other assets underlying those structured products.

66.     Because the Ratings Agencies elected – for profit reasons – not to implement models that would measure those default rates, it was foreordained that the Ratings Agencies' ratings of RMBS, CDOs and Structured Product ARS would be meaningless. The Ratings Agencies, however, falsely propped up the reliability of their ratings of RMBS, CDOs and Structured Product ARS by publicly misrepresenting that they analyzed the underlying loan data.

1. **Moody's Repeatedly Misrepresented That It Conducted Meaningful Analysis of Original Loan Data in Rating Structured Securities**

67. Moody's made repeated public statements – later revealed to be false – indicating that it routinely evaluated original loan data as part of its rating methodology for structured finance products, such as the Structured Product ARS sold to plaintiffs.

68. For example, a Moody's report dated April 1, 2003 that described its model for analyzing mortgage-backed securities contained a chapter entitled, "Originator and Servicer Practices and Loan Programs Continue to be Captured." In that report, Moody's stated:

> Moody's continues to rely on both quantitative means as well as qualitative reviews to assess originator and servicer quality and their impact on pool performance. These assessments form an integral part of Moody's Mortgage Metrics credit support calculations.
>
> Moody's considers numerous factors when determining the quality and performance of the originator and services, including:
>
> - Past performance of an originator's loans;
> - Underwriting guidelines for the mortgage loans and adherence to them;
> - Loan marketing practices;
> - Credit checks made on borrowers;
> - Appraisal standards;
> - Experience in origination of mortgages. . . .

(Moody's Investors Service, *Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools*, April 1, 2003).

69. In 2007, Moody's made similar representations:

> In addition to reported loan characteristics, qualitative elements of the origination and servicing processes influence pool performance. Moody's considers a number of these elements,

> including mortgage loan underwriting quality, underwriting
> guidelines, appraisal standards and the quality assurance processes.
> Underwriting guidelines and exception practices in the sub-prime
> market can vary substantially across originators, as can servicer
> quality, with a significant impact on loan quality and performance.
> ... Moody's view of the overall quality of origination, and
> servicing practices, as well as originators' historical performance is
> applied to assess the pool loss estimates.

(Moody's Investors Service, *Closed-End Seconds: Recent Performance and Update to*

*Methodology*, April 2, 2007.)

70.     These representations were materially false and misleading. As McDaniel, the

Chairman and Chief Executive Officer of Moody's parent corporation, admitted in his testimony

to Congress on October 22, 2008: "[W]e do not receive or review individual loan files."

## 2.     S&P Repeatedly Misrepresented That It Conducted Meaningful Analysis of Original Loan Data in Rating Structured Securities

71.     S&P also made repeated public statements – later revealed to be false – indicating

that it routinely evaluated original loan data as part of its rating methodology for structured

finance products, such as the Structured Product ARS sold to plaintiffs.

72.     S&P's Tillman testified before Congress on September 26, 2007 that "[t]he first

step in our analysis is evaluating the overall creditworthiness of a pool of mortgage loans by

conducting loan level analysis .... S&P also reviews the practices, polices [sic] and procedures

of the originators and servicers. ... For an originator, the topics we review include, but are not

limited to:  loan production practices; loan underwriting; and quality control practices and

findings." Chris Atkins, an S&P spokesman, was later quoted in an October 23, 2008 New York

Times article as representing that "[i]t has long been the practice of S&P to review loan level

data for new RMBS securities."

73.     These representations were materially false and misleading. Raiter, S&P's former

Managing Director and Head of Residential Mortgage Backed Securities Ratings, admitted to

Congress that S&P's loan evaluation practices were, in fact, non-existent. He stated that,

although the issue was robustly debated, "[t]he Managing Director of the surveillance area for

RMBS did not believe loan level data was necessary and that had the effect of quashing all

requests for funds to build in-house data bases" to evaluate such data.

## IV.     Relying Upon Defendants' Misrepresentations and Omissions, Plaintiffs Authorized Their Broker to Purchase ARS Based Upon Their High Investment Grade Ratings

74.     In establishing its investment policy and investment limits for Lehman, their

investment advisor, each of ASI and SEI relied upon, among other things, the professed

objectivity and integrity of the Ratings Agencies and the comparability of their structured

products ratings to ratings of conventional corporate debt. Stated simply, ASI and ESI believed

that Structured Product ARS rated AAA bore the same low risk as corporate debt rated AAA.

75.     To ensure safety of their cash, plaintiffs limited their investments to those

carrying High Investment Grade Ratings from Moody's, S&P and/or Fitch IBCA. Plaintiffs

were led to believe that they had minimal, if any, credit risk by restricting their investments to

only those securities that were rated at the very top of the Moody's and S&P scales, as indicated

by the following chart:

|  | Moody's | S&P | | |
|---|---|---|---|---|
| Highest | Aaa<br>Aa | AAA<br><br>AA | } | At least 80% of plaintiffs' portfolios were required to possess Aa/AA ratings or higher. |
|  | A | A | } | Up to 20% of plaintiffs' portfolios were allowed to possess A2/A ratings. |
|  | Baa | BBB | } | |
|  | Ba | BB | | |
|  | B | B | | Not eligible for inclusion in plaintiffs' portfolios. |
|  | Caa | CCC | | |
|  | Ca | CC | | |
| Lowest | C | SD/D | | |

76.     In 2004, SEI opened a custodial brokerage account with Lehman. In the summer of 2004, Lehman then sought discretionary authority from SEI to invest a significant portion of SEI's cash on SEI's behalf. SEI advised Lehman that SEI was not willing to trade security and liquidity for higher returns, and, as a result, SEI would only grant Lehman discretionary authority to invest in a manner consistent with SEI's existing conservative risk profile, whose risk tolerance required High Investment Grade Ratings from the defendants. Lehman agreed to and did abide by those restrictions.

77.     On or about January 28, 2005, SEI and Lehman then entered into a Cash Management Brokerage Agreement and Limited Discretionary Authorization (the "SEI Cash Account Agreement"), pursuant to which SEI gave Lehman limited discretion to invest cash that SEI would place in a discretionary account with Lehman (the "SEI Cash Account"). Lehman agreed that all purchases of securities for SEI would be consistent with SEI's conservative risk profile as codified in written investing guidelines (the "SEI Guidelines"). The SEI Guidelines

included as "Approved Securities" debt obligations of the U.S. Treasury, corporate debt obligations, certificates of deposit, time deposits, money market funds, and ARS.

78.   SEI agreed to add ARS to its Approved Securities list because SEI reasonably believed that, so long as those ARS carried the High Investment Grade Ratings from defendants required by SEI's conservative risk profile, the ARS would not subject SEI to any greater risk than other investments carrying the same ratings. Stated otherwise, SEI reasonably believed that the ratings defendants applied to ARS indicated a level of credit quality consistent with that of any other debt security to which the Rating Agencies had applied the same rating.

79.   On or about May 24, 2006, ASI also entered into a Cash Management Brokerage Agreement and Limited Discretionary Authorization with Lehman (the "ASI Cash Account Agreement"), which was supposed to govern the operation of ASI's own discretionary brokerage account with Lehman (the "ASI Cash Account"). As with SEI, the ASI Cash Account Agreement also incorporated written investing guidelines (the "ASI Guidelines") derived from and consistent with the SEI Guidelines. At Lehman's recommendation, the ASI Guidelines included U.S. Treasury bills, corporate bonds, commercial paper, and ARS. ASI agreed to add ARS to its Approved Securities for the same reason that SEI did so.

80.   In short, plaintiffs authorized Lehman to purchase ARS for their accounts only to the extent ARS met plaintiffs' Investment Guidelines. In granting that authority, plaintiffs reasonably believed that defendants' ratings of ARS accurately reflected each defendant's independent conclusions relative to its published standards. Plaintiffs relied upon the Rating Agencies' public representations that they were assigning ratings objectively in accordance with their published criteria and standards. Plaintiffs reasonably believed that the defendants'

assignment of a High Investment Grade Rating meant that the security conformed to the Rating Agencies' risk standards for assigning that rating and was less risky than securities that received lower ratings.

## V.   Defendants' Misrepresentations and Omissions Caused Plaintiffs Harm

81.   In reliance upon the defendants' promises to deliver unbiased, objective ratings predicated upon rigorous analysis, plaintiffs authorized Lehman to purchase for their accounts ARS that defendants had rated "A" or higher.  Based upon the Rating Agencies' representations, reasonably plaintiffs believed that that the ratings on those ARS represented a level of creditworthiness consistent with other debt products to which the defendants had assigned identical ratings.

82.   Throughout the time that plaintiffs had authorized Lehman to purchase such ARS:

   a.   plaintiffs reasonably relied upon the defendants' public representations of their independence, objectivity, consistency and substantial accuracy;

   b.   plaintiffs did not have any understanding, belief, or suspicion that the Rating Agencies were not independent or that the Ratings Agencies had a financial interest in assigning High Investment Grade Ratings to ARS;

   c.   plaintiffs did not have any understanding, belief, or suspicion that the Rating Agencies' ratings models were flawed or inadequate for rating Structured Products ARS, or that the Ratings Agencies had declined to employ models that would produce more meaningful and reliable results for Structured Produce ARS; and

        d.  plaintiffs did not have any understanding, belief, or suspicion that the Rating

Agencies were not monitoring the Structured Product ARS they had rated and

were not updating or correcting their previously issued ratings.

83.    Based upon plaintiffs' authorization, Lehman purchased for each of ASI and SEI

hundreds of millions of dollars worth of Structured Product ARS that bore High Investment

Grade Ratings.

84.    Because these Structured Product ARS were based upon extremely risky

subprime mortgage-related derivatives, they never warranted the High Investment Grade Ratings

the defendants gave them.

85.    Beginning in or around 2007, the house of cards that the Rating Agencies helped

to build based on subprime and other high-risk mortgages began to collapse. Holders of such

mortgages began to default at increasing rates, and those increasing defaults reverberated

throughout the RMBS, CDOs and Structured Product ARS that had been based upon those loans.

Billions of dollars worth of structured securities have defaulted and, in many cases, have become

worthless.

86.    It has now become clear that defendants misled plaintiffs – and other risk averse

investors – into purchasing the risky Structured Product ARS by assigning to those ARS grossly

inflated and unjustified ratings. Plaintiffs and other investors were unwittingly duped into

holding highly risky investments that far exceeded their risk tolerance parameters.

87.    After the subprime mortgage crisis revealed the true risks of those Structured

Product ARS, those ARS became illiquid, and plaintiffs have been left holding approximately

$70 million of unmarketable Structured Product ARS. The losses sustained by plaintiffs were a foreseeable consequence of the defendants' misrepresentations and omissions.

88.     Had plaintiffs known the facts set forth herein, plaintiffs would not have permitted Lehman to purchase the Structured Product ARS for their accounts, and would not have suffered the harm they did.

## COUNT I
### (Fraud)

89.     Plaintiffs reallege the allegations of paragraphs 1 through 90 hereof.

90.     With the intent of inducing plaintiffs to purchase Structured Product ARS and to continue holding Structured Product ARS, defendants knowingly and/or recklessly made false representations of fact.

91.     Defendants, with knowledge of or reckless disregard for the truth, disseminated the false statements specified above, which were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.     Defendants' aforementioned misrepresentations and omissions are material factors that reasonable investors, including plaintiffs, would have considered important in making an investment decision.

93.     Defendants' misrepresentations, misleading statements and omissions were not "forward looking" statements because they were statements of current or historical fact. The

statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.

94.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because: (i) such statements, made intentionally by defendants, were material; (ii) at the time each of those forward-looking statements was made, defendants had actual knowledge that the particular forward-looking statement was false or misleading; and/or (iii) such statements were not identified by defendants as "forward-looking" and lacked meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

95.     At all relevant times, the market for Structured Product ARS was an efficient market because the securities: (i) actively traded on the auction-rate securities market, which had a large weekly trading volume; (ii) were followed and reported on by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and made publicly available; and (iii) had market makers and arbitrageurs that traded in them.

96.     Defendants' materially misleading statements and omissions were reflected in the primary offering and subsequent market price of the Structured Product ARS.

97.     Plaintiffs purchased the Structured Product ARS between the time the misrepresentations were made and the time the true credit risks of investing in such securities were revealed.

98.     Plaintiffs purchased the Structured Product ARS in reliance not only on the

market price, which incorporated defendants' ratings, but also in reliance on the integrity of the

ARS market itself, on which the Structured Product ARS could not have traded absent

defendants' fraudulent and misleading statements and omissions.

99.     By reason of the foregoing, plaintiffs have been damaged in an amount to be

determined at trial.

## COUNT II
### (Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5 Promulgated Thereunder)

100.    Plaintiffs reallege the allegations of paragraphs 1 through 100 hereof.

101.    Defendants intentionally and/or recklessly: (a) employed a device, scheme and

artifice to defraud plaintiffs with respect to the sale of the Structured Product ARS; (b) made

untrue statements of material fact or omitted to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading;

and (c) engaged in acts, practices, or courses of business that operated as a fraud and deceit upon

plaintiffs in connection with the sale and purchase of plaintiffs' ARS, in violation of Section

10(b), 15 U.S.C. § 78i(b), of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated

thereunder.

102.    Plaintiffs reasonably relied upon defendants' false representations as to the credit

quality of the Structured Product ARS in purchasing and holding tens of millions of dollars

worth of Structured Product ARS.

103. Had plaintiffs known that the truth about Structured Product ARS and defendants' rating of them, plaintiffs would not have purchased and held such ARS.

104. Plaintiffs commenced this action within two years of February 2008, when they first became aware that the Structured Product ARS might not have the credit quality falsely represented by defendants, and within five years of the date they purchased, through Lehman, the relevant ARS.

105. By reason of the foregoing, plaintiffs have been damaged in an amount to be determined at trial.

## COUNT III
### (Violation Of Ohio's Blue Sky Laws)

106. Plaintiffs reallege the allegations of paragraphs 1 through 106 hereof.

107. The Structured Product ARS plaintiffs now own were offered for sale pursuant to offering materials that contained false statements, omitted to state material facts necessary in order to make the statements made not misleading, and contained unfounded and unjustified ratings.

108. Specifically, the offering materials falsely represented that the Structured Product ARS plaintiffs purchased had a credit quality consistent with defendants' criteria for High Investment Grade Ratings.

109. In fact, those Structured Product ARS did not have a credit quality consistent with defendants' criteria for High Investment Grade Ratings, because, as defendants well knew, those

ARS were in fact related to, based upon, and subject to the credit risks of highly risky subprime mortgage debt.

110. Defendants participated in and aided in the sale of plaintiffs' Structured Product ARS, including by falsely representing that those ARS were of a credit quality consistent with defendants' High Investment Grade Ratings, and defendants did so in violation of Sections 1707.41, 1707.43 and 1707.44 of the Ohio Securities Act.

111. Plaintiffs reasonably relied upon the offering materials, including but not limited to, the false representations of credit quality contained therein, in purchasing and holding, through Lehman, the Structured Product ARS. Had plaintiffs known the truth about the credit quality of the Structured Product ARS represented in the offering materials, plaintiffs would not have purchased those ARS.

112. By reason of the foregoing, plaintiffs have been damaged in an amount to be determined at trial.

## COUNT IV
## (Negligent Misrepresentation)

113. Plaintiffs reallege the allegations of paragraphs 1 through 113 hereof.

114. Plaintiffs were part of a select and limited class of qualified investors to whom defendants intended their ratings to be ultimately supplied as part of the offering materials.

115. Defendants issued ratings of Structured Product ARS to provide guidance to investors such as plaintiffs in making investment decisions, and defendants knew that their ratings would be relied upon by plaintiffs and other members of this class of investors.

116.   Plaintiffs had a reasonable expectation that defendants were independent, that defendants' methods valid and objective, and that defendants' ratings of Structured Product ARS accurately reflected the credit quality of such instruments.

117.   Defendants knew or should have known that their representations about Structured Product ARS were false and misleading.

118.   Defendants made their made material misrepresentations and omissions of fact negligently and carelessly.

119.   But for the defendants' material misrepresentations and omissions of fact, the Structured Product ARS would have been unmarketable.

120.   Plaintiffs reasonably relied to their detriment upon defendants' negligent misrepresentations and omissions by purchasing and holding tens of millions of dollars worth of Structured Product ARS that are now illiquid and devalued.

121.   As a direct and proximate consequence of defendants' negligent misrepresentations, plaintiffs have suffered damages in an amount to be determined at trial.

**WHEREFORE**, plaintiffs demand judgment:

(a)   awarding plaintiffs compensatory damages in amounts to be determined at trial, but not less than $70 million, together with interest, attorneys' fees, costs and disbursements; and

(b)   awarding plaintiffs punitive and exemplary damages in amounts to be determined at trial; and

(c)   such other and further relief as is just and proper.

Respectfully submitted,

John W. Zeiger   (0010707)
Marion H. Little, Jr.   (0042679)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-9900
(Fax) (614) 365-7900
Zeiger@litohio.com
little@litohio.com

Attorneys for Plaintiffs
American Signature, Inc. and SEI, Inc.

Jury Demand

Plaintiffs demand a trial by jury, in the maximum number provided by law, as to all claims and issues properly triable to a jury.

Marion H. Little, Jr.   (0042679)